IN THE COURT OF APPEALS OF TENNESSEE
AT JACKSON
Submitted on Briefs May 17, 2004

## ROY HUGH RUSHING, II v. JILL MARIANNE RUSHING

**An Appeal from the Chancery Court for Madison County**
**No. 57012      John Franklin Murchison, Chancellor**

———

**No. W2003-01413-COA-R3-CV - Filed October 27, 2004**

———

This is a post-divorce child custody case. The parties were divorced by a final decree which incorporated the parties' marital dissolution agreement ("MDA"). The MDA provided, among other things, that the parties would have joint custody of their two minor children, and that the mother would be the primary residential parent. The MDA also stated that the father would provide life insurance on the children's lives, and that the maternal grandmother would arbitrate the parties' disputes. Approximately two years later, the mother filed a motion for contempt, claiming that the father had failed to provide the required life insurance on the children's lives. In response, the father filed a motion to increase his residential time with the children and also sought court approval to provide term-life insurance as opposed to whole-life insurance on the children's lives. In addition, the father asked the court to strike the MDA provision stating that the maternal grandmother would be the final arbiter of the parties' child rearing disputes. The trial court denied the mother's motion for contempt and granted the father's motion for modification of the MDA. The mother now appeals. We affirm.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court is Affirmed**

HOLLY M. KIRBY, J., delivered the opinion of the Court, in which ALAN E. HIGHERS, J., and DAVID R. FARMER, J., joined.

Mary Jo Middlebrooks and Betty Stafford Scott, Jackson, Tennessee, for the appellant, Jill Marianne Rushing.

Lisa A. Houston, Jackson, Tennessee, for the appellee, Roy Hugh Rushing.

**OPINION**

In November 1992, Plaintiff/Appellant Roy Hugh Rushing, II ("Father"), and Defendant/Appellant Jill Marianne Rushing ("Mother") were married. Two children were born during the marriage, Molly Danielle Rushing (born April 15, 1994) and River Jacob Rushing (born October 20, 1995). On February 8, 2000, Father filed for divorce. On February 28, 2000, the parties

filed with the trial court a Marital Dissolution Agreement ("MDA"). The MDA provided that the parties would have joint custody of the children, but that Mother would be the primary residential parent and Father would have parenting time every other weekend. Father agreed to pay Mother $185.50 per month in child support. The parties also agreed that each would pay "one-half of the premium for the children's life insurance policy with both Husband and Wife as irrevocable beneficiaries until the parties' minor children reach the age of eighteen (18) or are otherwise emancipated." Finally, the MDA stated that, "[s]hould the parties not be able to agree on a child rearing decision they agree to appoint Sandra Hornsby[, Mother's mother,] as arbitrator and that her decision be final." On May 22, 2000, the trial court entered a final decree of divorce on the grounds of irreconcilable differences, incorporating the parties' MDA into the final decree.

On December 16, 2002, Mother filed a "Motion For Civil Contempt and to Increase Child Support." Mother alleged, among other things,[1] that Father had violated the terms of the final decree by failing to pay half of the $50 monthly premium for the children's life insurance policies for the period from June 2002 through December 2002, and that Father's total arrears for the life insurance was $175.[2]

On December 27, 2002, Father filed a response and a "Counter-Motion," seeking to modify the residential arrangement for the children set forth in the divorce decree, requesting that he have residential parenting time with the children for a full week on alternating weeks. Father also sought to have the arbitration provision in the decree eliminated. Father explained that he no longer felt comfortable having Mrs. Hornsby, his former mother-in-law, as the arbitrator because, after entry of the divorce decree, Mr. Hornsby, Mother's father, had assaulted him. Father argued that this would likely cause Mrs. Hornsby to be biased towards Mother in the resolution of any parenting dispute. In response to Mother's claim that he was in arrears on his life insurance obligation, Father said that he had procured alternative, less expensive life insurance policies for the children at his own cost and therefore was not in contempt.

On January 5, 2003, Mother filed a motion to dismiss Father's counter-motion, arguing that no material change in circumstances had occurred to justify a modification of the divorce decree. Mother asserted that Father was required to arbitrate any grievances regarding the children in

_____

[1]Mother also argued that Father's child support obligation should be increased because of an increase in Father's income. The trial court found that Father's income had increased less than 15% and that, therefore, there was no significant variance in Father's income so as to justify an increase in child support. In addition, Mother requested that Father be required to show proof of life insurance on his own life, and Father did so to the satisfaction of the trial court. Mother did not appeal the trial court's decision with respect to those issues.

[2]The motion for contempt asserted that Father had failed to pay the required life insurance premiums "[s]ince June, 2001," which would mean that Father had been in arrears for nineteen months and had accrued an arrearage of $475. The motion also indicated, however, that the amount of Father's total arrearage was $175. The parties' appellate briefs assert that Father's total arrearage was $175, not $475. Therefore, we will assume for purposes of this Opinion that Father's total arrearage was $175, and that Father's alleged failure to pay the required life insurance premiums began in June 2002, not June 2001.

accordance with the arbitration provision in the MDA. The trial court scheduled a hearing on both parties' motions for January 17, 2003.

Both parties testified at the hearing. In her testimony, Mother explained the parties' arrangement for parenting time when they initially entered into the MDA. Mother stated that Father initially kept the children on Tuesday and Thursday nights, in addition to his regular scheduled parenting time every other weekend, because she was in school at that time and needed child care. When Mother was no longer in school, she no longer needed Father to keep the children on those days. Mother indicated that on his Tuesday and Thursday night visits with the children, Father became inconsistent in the times he would pick up the children and take them home, and that the children at times did not want to go with him. As a result, Mother told Father that she no longer wanted him to have parenting time with the children on those two extra days. The MDA provided only that Father would have residential parenting time with the children every other weekend, and Father wanted to have more parenting time than that which was provided. The parties, however, were unable to agree on an alternative arrangement. Mother testified that she would not agree to allow Father to have the children for a full week on alternating weeks. She also testified that she would not agree to allow Father to have parenting time with the children for the two extra weekdays that the parties initially adhered to, because the children were now school age and it would be disruptive, their grades would go down, and Father frequently did not get them to school on time when he had responsibility for doing so.

Mother also testified about Father's life insurance obligation. She said that, when the children were very young, she and Father had obtained whole-life insurance policies on both of the children through John Hancock insurance. Those policies guaranteed death benefits of $50,000 for each child. In addition, the whole-life policies were projected to earn money over the course of the children's lives for college or other necessities. Mother explained that the parties got the policies because River had breathing problems, and a whole-life policy would guaranty that he would always be insurable. The premium for the whole-life policies was $50 per month, and Mother said that Father had stopped paying his half of the premium. His failure to pay his half of this premium resulted in the arrearage she claimed.

Mother also testified about the altercation between Father and Mother's father, Mr. Hornsby. Sometime after the divorce, Father came to the Hornsbys' house pick up the children. Mother was there at the time. After the children and Father were in Father's car and about to leave, Father and Mother began to argue. The parties' daughter, Molly, became upset and went into the Hornsby's house crying to her grandparents. Mr. Hornsby ran outside and saw Father attempting to push Mother away from his car. Mr. Hornsby then reached into Father's car and hit Father. Despite this event, Mother testified, Mrs. Hornsby had never indicated that she could not be fair to Father as the arbitrator of their parenting disputes. Mrs. Hornsby also testified at trial. She said that there had been no change in her relationship with Father since the MDA was executed, and that she would not tend to favor Mother over Father in the resolution of any parenting dispute.

Father also testified at the hearing. He indicated that he has remarried since the parties' divorce, and that he now has a much more "stable situation" at home. Father said that his seven-year-old stepdaughter lives with him and his current wife, and that all of the children get along well. Father said that, when the children are with him, he takes them to church, attends their ball games, and assists in their homework. Father testified that he had worked at Proctor and Gamble since before the divorce, and that his job required him to work odd schedules. He explained that there are times when he is off work for the entire work week, but then has to work on the weekend. There are also times when Father works during the week, and then is off on the weekend. He sought residential parenting time with the children for a full week on alternating weeks with Mother, so as to maximize the time he spends with the children and give them some continuity.

With respect to the children's life insurance, Father testified that he was able to get term-life insurance policies for both of the children through his work for $2.34 per year for both children. The policies did not accumulate value as a whole-life policy would, but the term-life policies provided death benefits to cover any funeral expenses in the event the child died. Father did not testify about the amount of the death benefits on the term-life policies, but indicated that he could increase the coverage at minimal expense. Father said that he and Mother did not originally discuss the accrued value of the whole-life policies as being a source for college tuition, but agreed that buying the policies was part of a plan for the children to have money when they got older. In any event, Father sought court approval to provide the cheaper term-life policies rather than continuing to maintain the expensive whole-life policies.

Father testified that he had not seen Mr. Hornsby nor had he been to the Hornsbys' house since the altercation with Mr. Hornsby. Father said that, after the confrontation, he filed a report with the local sheriff's department, but then dropped the matter to prevent any further "bad blood" between the families. Father explained that, when he signed the MDA, he and Mother were getting along well, and that, at that time, he was willing to agree to allow Mrs. Hornsby to arbitrate disputes between Mother and him. He indicated that his relationship with Mother's parents had become strained since his confrontation with his former father-in-law. Consequently, Father asked that the arbitration provision be stricken from the MDA, because he felt that Mrs. Hornsby could not fairly resolve any dispute between them.

On April 2, 2003, the trial court, Chancellor Joe C. Morris, entered an order denying Mother's motion for contempt and granting Father's request for modification of the MDA. The trial court held that Father's request to provide the less expensive term-life insurance rather than the whole-life insurance was "reasonable under the circumstances and should be granted." Nevertheless, the trial court ordered Father to pay Mother his half of the whole-life policy premiums up to January 31, 2003, and ordered Mother to pay half of the term-life insurance premium. In addition, the trial court ordered that the arbitration provision in the MDA be stricken "as being an unreasonable interference with the powers of the Court and the rights of the parties to equal access to the Court . . . ." Finally, the trial court modified the parties' parenting schedule and allowed Father to have

residential parenting time with the children for a full week on alternating weeks.[3] The trial court explained:

> The Father has testified as to his work schedule at Procter & Gamble, and has provided the Court with a general schedule of his time. The Father has stated that because of his work schedule, he is unable to spend the normal amount of time with the children under the currently existing schedule. . . . Both children are of school age, and both parties have remarried and have adequate homes. The Court has examined the Father's schedule and finds the current parenting schedule is not conducive to a full parent/child relationship and therefore Orders that the schedule be changed to provide that the Father have the children with him during the alternating weeks . . . .

Therefore, based on the ages of the children, the fact that both parents had remarried, and the circumstances of Father's work schedule, the trial court granted Father custody of the children for a full week on alternating weeks. The parties were deemed responsible for their own attorney's fees. On April 22, 2003, Mother filed a motion to alter or amend the trial court's decision pursuant to Rule 59 of the Tennessee Rules of Civil Procedure.[4] On May 19, 2003, the trial court conducted a hearing on Mother's motion to alter or amend.[5] On May 23, 2003, the trial court, Judge Franklin Murchison, entered an order denying Mother's motion to alter or amend. From that order, Mother now appeals.

On appeal, Mother argues that the trial court erred in modifying the provisions in the final divorce decree, because the trial court cited no change in circumstances to warrant the modification, nor did the trial court find that the modification would be in the best interest of the children. Because there was no change in circumstances nor any best interest analysis, Mother argues, the trial court erred in modifying the MDA with respect to the parties' parenting time arrangement, life insurance provision, and arbitration requirement. Mother also seeks her attorney's fees for the trial court proceedings as well as attorney's fees incurred in this appeal.

The trial court's findings of fact are reviewed *de novo*, with a presumption that those findings are correct unless the evidence preponderates otherwise. ***Kendrick v. Shoemake***, 90 S.W.3d 566, 570 (Tenn. 2002); ***Hass v. Knighton***, 676 S.W.2d 554, 555 (Tenn. 1984); Tenn. R. App. P. 13(d). However, when the trial court makes no specific findings of fact, this Court must review the record to determine where the preponderance of the evidence lies. ***Kendrick***, 90 S.W.3d at 570. The trial court's decision regarding custody and visitation will be afforded great weight, because the trial judge had the opportunity to hear the witnesses, observe their demeanor, and judge their credibility. ***See Bah v. Bah***, 668 S.W.2d 663, 665 (Tenn. Ct. App. 1983). The trial court's conclusions of law

---

[3]The trial court also clarified the parties' holiday parenting schedules. It appears that Mother does not object to the trial court's decision regarding the holiday schedules.

[4]Chancellor Morris died on April 27, 2003, before Mother's motion was heard.

[5]There is no transcript of this hearing in the appellate record.

are reviewed *de novo*, with no presumption of correctness. ***Ganzevoort v. Russell***, 949 S.W.2d 293, 296 (Tenn. 1997); ***Jahn v. Jahn***, 932 S.W.2d 939, 941 (Tenn. Ct. App. 1996).

When a decree has been entered providing for the custody and care of minor children, that decree is *res judicata* and is conclusive in a subsequent petition for a change in the decree, "unless some new fact has occurred which has altered the circumstances in a material way to make the welfare of the children require a change in custody." ***Long v. Long***, 488 S.W.2d 729, 731-32 (Tenn. Ct. App. 1972). Thus, the "threshold issue" is whether a material change in circumstances has occurred since the decree was entered. ***Blair v. Badenhope***, 77 S.W.3d 137, 150 (Tenn. 2002). The Supreme Court in ***Blair*** explained factors to consider in determining whether a change in circumstances has occurred:

> "There are no hard and fast rules for determining when a child's circumstances have changed sufficiently to warrant a change of his or her custody." ***Solima v. Solima***, 7 S.W.3d 30, 32 (Tenn. Ct. App. 1998). Nevertheless, the following factors have formed a sound basis to determine whether such a change has occurred: the change has occurred after the entry of the order sought to be modified and the change is not one that was known or reasonably anticipated when the order was entered, ***see Smith v. Haase***, 521 S.W.2d 49, 50 (Tenn. 1975), and the change of circumstances is one that affects the child's well-being in a meaningful way, ***Hoalcraft v. Smithson***, 19 S.W.3d 822, 829 (Tenn. Ct. App. 1999).

***Blair***, 77 S.W.3d at 150. In ***Kendrick***, the Supreme Court recognized "that a parent's change in circumstances may be a material change in circumstances for the purposes of modifying custody if such a change affects the child's well-being." ***Kendrick***, 90 S.W.3d at 570. In addition, "[e]vidence that an existing custody and visitation arrangement is not working is sufficient to support a finding of material change of circumstances." ***Turner v. Purvis***, M2002-00023-COA-R3-CV, 2003 WL 1826223, at *4 (Tenn. Ct. App. Apr. 9, 2003) (citing ***Vaccarella v. Vaccarella***, 49 S.W.3d 307, 315-16 (Tenn. Ct. App. 2001)). "If a material change in circumstances has occurred, it must then be determined whether the modification is in the child's best interests" according to the factors enumerated in Tennessee Code Annotated § 36-6-106.[6] ***Kendrick***, 90 S.W.3d at 570. The

_____

[6]Those factors are as follows:

   (1) The love, affection and emotional ties existing between the parents and child;

   (2) The disposition of the parents to provide the child with food, clothing, medical care, education and other necessary care and the degree to which a parent has been the primary caregiver;

   (3) The importance of continuity in the child's life and the length of time the child has lived in a stable, satisfactory environment; provided, that where there is a finding, under § 36-6-106(8), of child abuse, as defined in § 39-15-401 or §39-15-402, or child sexual abuse, as defined in § 37-1-602, by one (1) parent, and that a non-perpetrating parent has relocated in order to flee the perpetrating parent, that such relocation shall not weigh against an award of custody;

-6-

determination of a child's best interest turns on the particular facts of each case. ***See Taylor v. Taylor***, 849 S.W.2d 319, 326 (Tenn. 1993); ***In re Parsons***, 914 S.W.2d 889, 893 (Tenn. Ct. App. 1995).

In this case, Mother argues that, since the entry of the parties' divorce decree, there has been no change in circumstances sufficient to warrant the modifications made by the trial court. She points out that Father did not indicate that he had a problem with the terms of the MDA until after she filed her motion for contempt. Father cannot rely on his variable work schedule as a changed circumstance, Mother argues, because his employer and his schedule remained the same as when the divorce decree was entered. Mother also points out that Mrs. Hornsby testified that her relationship with Father has not changed since the entry of the final decree, and that she still has the children's best interest at heart.

In its April 2003 order, the trial court in this case made some findings of fact, but did not identify a specific "material change in circumstances." In addition, the trial court did not expressly determine that modification of the decree was in the best interest of the children. In such a situation, in which the trial court does not identify a specific change in circumstances and fails to articulate a best interest analysis, "our task of reviewing the decision [is made] more difficult." ***Kendrick***, 90

---

(4) The stability of the family unit of the parents;

(5) The mental and physical health of the parents

;

(6) The home, school and community record of the child;

 (7) The reasonable preference of the child if twelve (12) years of age or older. The court may hear the preference of a younger child upon request. The preferences of older children should normally be given greater weight than those of younger children;

(8) Evidence of physical or emotional abuse to the child, to the other parent or to any other person; provided, that where there are allegations that one (1) parent has committed child abuse, [as defined in § 39-15-401 or § 39-15-402], or child sexual abuse, [as defined in § 37-1-602], against a family member, the court shall consider all evidence relevant to the physical and emotional safety of the child, and determine, by a clear preponderance of the evidence, whether such abuse has occurred. The court shall include in its decision a written finding of all evidence, and all findings of facts connected thereto. In addition, the court shall, where appropriate, refer any issues of abuse to the juvenile court for further proceedings;

(9) The character and behavior of any other person who resides in or frequents the home of a parent and such person's interactions with the child; and

(10) Each parent's past and potential for future performance of parenting responsibilities, including the willingness and ability of each of the parents to facilitate and encourage a close and continuing parent-child relationship between the child and the other parent, consistent with the best interest of the child. . . .

Tenn. Code Ann. § 36-6-106(a) (2001).

S.W.3d 570-71. In any event, where no specific findings have been made, "we must review the record to determine where the preponderance lies." *Id.* at 570.

Father argues that the trial court's decision to modify the original parenting time arrangement was justified by several changes in the parties' circumstances. He claims that both parties believe that the original arrangement is not workable because of his work schedule. In addition, he contends that the amicable relationship that once existed between Mother and him has deteriorated in the past year, especially since Mother refused to allow Father to see the children on Tuesday and Thursday nights. Father argues that the children's best interest is served by allowing them to stay at his house when he is home, rather than when he is at work. He points out that he has remarried and enjoys a more stable home environment, with sufficient space for Molly and River, along with their seven-year-old stepsister.

As noted above, a material change in circumstances can be established by showing that an existing parenting time arrangement is not working. See *Turner v. Purvis*, 2003 WL 1826223, at *4. In addition, an improvement in the circumstances of the noncustodial parent can be deemed a material change in circumstances. *See Scales v. Mackie*, No. M2001-03161-COA-R3-CV, 2003 WL 43355, at *5 (Tenn. Ct. App. Jan. 7, 2003). In this case, the testimony submitted at the hearing below shows that, while Mother and Father once enjoyed an amicable, cooperative relationship, the parties are now at loggerheads for a variety of reasons. Although it is not written into the parties' MDA, initially Father routinely enjoyed parenting time with the children while Mother was in school on Tuesdays and Thursdays. When Mother was no longer in school and did not need the child care, from her standpoint, the additional time for Father to be with the children became unacceptable. This meant that Father's only residential parenting time was every other weekend. If his variable work schedule required him to work that weekend, he had no parenting time with the children. Thus, in light of the increasingly uncooperative relationship between Mother and Father and the elimination of the Tuesday and Thursday night parenting time, the original parenting arrangement became unworkable. Moreover, although Mother claimed that Father was unable to stay on a regular schedule and unable to get the children to school on time when he had them on the extra days, the evidence does not support Mother's apparent assertion that Father cannot adequately handle parenting responsibilities. The trial court observed: "[b]oth children are of school age, and both parties have remarried and have adequate homes." Thus, Father's remarriage and his home situation had improved the circumstances for Father since the parties entered into the MDA. The trial court further noted that giving Father the additional residential parenting time would be "conducive to a full parent/child relationship," indicating that the modification would be in the best interest of the children. Thus, considering all of the circumstances and the factors in Tennessee Code Annotated § 36-6-106(a), we conclude that the evidence preponderates in favor of a finding that a material change in circumstances has occurred, and that modifying the original decree to give Father residential parenting time with the children for a full week on alternating weeks is in the best interest of the children.

With respect to the arbitration provision, Mother argues that the altercation between Father and Mr. Hornsby, on which Father relies, did not change the parties' relationships or any other

circumstances that existed when the MDA was signed. She cites Mrs. Hornsby's testimony that the incident did not affect her ability to fairly arbitrate the parties' disputes. Thus, Mother argues, the trial court erred in modifying the MDA to eliminate the arbitration provision. The trial court stated only that striking the arbitration provision was "reasonable under the circumstances." In doing so, the trial court implicitly discredited Mrs. Hornsby's testimony and found reasonable Father's concern that Mrs. Hornsby could no longer impartially arbitrate the parties' parenting disputes. Certainly the evidence preponderates in favor of this conclusion. Therefore, we affirm the trial court's decision to strike the arbitration provision in the parties' MDA.

Finally, Mother argues that the trial court erred in allowing Father to provide term-life insurance rather than keeping the whole-life policy originally procured by the parties. The MDA provides:

> **Children's Life Insurance:** Each party agrees to pay one-half of the premium for the children's life insurance policy with both Husband and Wife as irrevocable beneficiaries until the parties' minor children reach the age of eighteen (18) or are otherwise emancipated.

Father points out that the MDA does not require that he provide whole-life insurance, as opposed to term-life insurance. Thus, Father argues, the trial court did not modify the life insurance provision in the parties' MDA. Mother argues that the testimony at trial shows that the parties intended to maintain the whole-life policies for the children. Father admitted this fact, Mother claims, when he testified that getting the whole-life insurance "was a plan to have – for them to have some money when they were older." Under these circumstances, she argues, Father should not be permitted to decide unilaterally to provide term-life insurance instead of the whole-life insurance that the parties contemplated when they signed the MDA.

The MDA in this case unambiguously requires Mother and Father to provide insurance on the children's lives, with Mother and Father to be the irrevocable beneficiaries. It does not specify whole-life insurance. Therefore, the trial court's order permitting Father to procure the less expensive term-life policies was consistent with the terms of the MDA. We find no error in this decision.

Considering the above holdings, Mother's request for attorney's fees for the trial court proceedings and for this appeal is declined.

The decision of the trial court is affirmed. Costs on appeal are to be taxed to Appellant Jill Marianne Rushing, and her surety, for which execution may issue, if necessary.

_____
HOLLY M. KIRBY, JUDGE